(No. 33630.—

EMIL RECK, Plaintiff in Error, *vs*. THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error.

*Opinion filed November 23, 1955*

EDMUND HATFIELD, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, GEORGE W. SCHWANER, JR., IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, WILLIAM L. CARLIN, and R. JAMES PLATT, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Emil Reck, plaintiff in error, comes here from the criminal court of Cook County where he was unsuccessful in a hearing under the Post-Conviction Hearing Act. On May 29, 1936, Reck, whom we shall refer to as the petitioner, was sentenced to the Illinois Penitentiary for a term of 199 years as a result of a jury verdict finding him guilty of murder.

Briefly the facts that produced petitioner's conviction are the following: Dr. Peacock, a prominent Chicago pediatrician residing in an Edgewater Beach apartment, on the night of January 2, 1936, responded to a telephone call at his home to administer medical aid to a child living at 6438 North Whipple Avenue. He left his apartment in his automobile but did not return. The following afternoon his lifeless body was found, drenched in blood, slumped on the rear floor of his car, parked at 6326 North Francisco Avenue, Chicago. There were thirteen deep lacerations on his head and a bullet hole passing through his brain. There were no fingerprints. There were no clues. The doctor had no enemies. The Chicago Medical Society offered a substantial reward. Every conceivable effort was made to find a solution to this mysterious brutal homicide. Daily newspaper notoriety attended the search for the guilty. Almost three months elapsed before a solution appeared in the confession obtained from four teenage boys.

On Wednesday, March 25, 1936, petitioner, age 19, Durland Nash and Robert Goeth also 19 and Michael Livingston, age 17, were arrested on suspicion of stealing bicycles. Livingston was released to his mother on Thursday and later rearrested. These boys were questioned about many robberies and burglaries and were shifted from one police station to another, being on parade at many "show ups." By accident these boys were questioned about the Peacock murder, and then, only after having been detained 72 hours, Durland Nash was the first to confess, implicating Goeth, Reck and Livingston. On the following Sunday, the four boys were taken to the private office of the first assistant State's Attorney Crowley to make a joint confession in the presence of a court reporter. Their statement of what transpired on the night of January 2, 1936, runs as follows:

In the early evening of January 2, 1936, the four boys

met and were riding in a Ford automobile driven by Jimmy Nash. They stopped at a Walgreen drug store somewhere on North Western Avenue. Robert Goeth and Nash got out of the car, went into the drug store, called Dr. Peacock and requested that he make a professional call on a sick child at 6438 North Whipple Street. The boys, while planning the robbery, had previously explored this neighborhood and found it to be dark and unfrequented. The two boys came back to the car and reported that their victim would be at the above address shortly, whereupon they drove there and parked their car nearby. Dr. Peacock arrived, parked his car in front of 6438, alighted from the car with his medicine case, and was approached by Robert Goeth who put a gun in his back and ordered him to re-enter his car, which he did. Livingston remained in the Ford and followed the doctor's car which was driven by Nash with Goeth sitting on his right and the petitioner with the doctor in the rear seat. After they drove some distance they ordered the doctor out of his car and demanded his money. He said he didn't have any money and started fighting with Goeth. When Goeth got loose he fired two shots at the doctor, and while the doctor was lying on the ground breathing heavily, Reck finished killing him with a wooden club about one foot in length that he carried as a weapon. The boys searched the doctor's pockets and found $20, divided it equally, and left him lying on the floor of the rear seat of his car. Goeth also struck him several times with the butt of his gun while he was lying on the ground. After driving away the four separated and went their respective ways.

The foregoing is only a very brief summary of that which is contained in question and answer statements covering 13 printed pages. After being typed it was read and signed by each. It contained the usual warning that it would be used against them in criminal proceedings that

would ensue. The basic contention of petitioner is that his conviction was predicated upon a confession obtained from him by coercion.

Apart from the confession, Reck has constantly proclaimed his innocence. Emil Reck was a lad that was classified as a border line mental defective with an IQ of not more than 70. Prior to his entry of a plea of not guilty and trial, he was found not to be a feeble minded person by a jury that was impaneled to determine that issue. Emil's mother deserted him when he was two years old, and as a dependent, never as a delinquent, he became a ward of the juvenile court of Chicago and for a while was placed in an orphanage. Aside from his retardation, he was never a behavior problem and bore no criminal record. Petitioner was in the custody of the police for a week, during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher. During that week no formal charge was placed against petitioner, and he was confined practically *incommunicado*. Petitioner details a harrowing story of brutality and mistreatment saying he was beaten and kicked many times, and "I was hanged on the door four or five times and allowed to remain several minutes." The three accomplices were brought back to testify at the post-conviction hearing, and they partly corroborated Reck in his claim of mistreatment and coercion.

It should be observed that petitioner throughout these proceedings has been represented by able and alert counsel. On the original trial a full hearing on the validity of the confession was had out of the presence of the jury. The trial judge ruled that the confession met all legal requirements. A similar hearing was had before the jury. The verdict of guilty and judgment thereon represent another determination that the confessions here under scrutiny did not emanate from coercion. The question of their admissi-

bility was not presented for review on the writ of error in *People* v. *Reck*, 392 Ill. 311.

There were many witnesses on behalf of the people who gave testimony that contradicted petitioner's tales of brutality. When the confessions were signed they called in former members of a grand jury and disinterested doctors to witness the signing. Assistant State's Attorney Kearney on the post-conviction hearing freely admitted that he did this to buttress his case against future contentions of duress. The police denied categorically all charges of abuse. There were six doctors, several attorneys, court reporter and photographers, all of whom testified that petitioner exhibited no contusions, abrasions, discoloration or any signs of abuse. The record is replete with testimony that when the boys signed the confession they did so freely, voluntarily and without any promise of reward; that they had read the statement over, and that the boys stated it contained the truth.

There is an irreconcilable conflict in the two factual pictures as presented by the petitioner and the People. Two trial judges and one jury saw and heard the witnesses on both sides and reached the conclusion that petitioner's charge of coercion was without merit. Such finding will not be disturbed by a reviewing court unless manifestly against the weight of the evidence. (*People* v. *Reed*, 333 Ill. 397, 410.) There is little in the record outside the testimony of petitioner and his confederates that the challenged confession was not voluntary. The statements signed by the four boys are complete, detailed and consistent, which, together with the circumstances surrounding their execution compel the conclusion that they represent the truth freely and voluntarily uttered.

The record conclusively demonstrates that petitioner, Nash, Goeth and Livingston had been arrested originally because of their suspected involvement in many robberies

and burglaries. The first three days of their confinement was entirely devoted to their being questioned about crimes independent of the Peacock murder. For only twenty-four hours before the confessions were obtained were the boys asked about the instant homicide. We are of the opinion that petitioner's constitutional rights were not infringed under the facts as disclosed by the record in this case. (*People* v. *Kelly,* 404 Ill. 281.) The judgment of the criminal court of Cook County denying the prayer of the post-conviction petition is affirmed.

*Judgment affirmed.*